IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



**FILED - GR**
December 14, 2009 9:57 AM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: ___mrs__ /_____

CORNERWORLD CORPORATION.  §
                          §
        Plaintiff,        §
                          §
                          §        CIVIL ACTION NO.:
v.                        §
                          §        **1:09-cv-1124**
NED TIMMER, JOLEE TIMMER, FIONA  §
WICKS, and PETER LAZOR    §        **Robert Holmes Bell**
                          §        **U.S. District Judge**
                          §
        Defendant.

## PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES

Plaintiff CornerWorld Corporation ("CW" or "Plaintiff") files its Original Complaint and

Application for Temporary Restraining Order, Injunctive Relief and Damages ("Complaint")

against Ned Timmer, JoLee Timmer, Fiona Wicks and Peter Lazor (collectively "Defendants"),

and would respectfully show the Court as follows:

### I.
### PARTIES

1.      Plaintiff CW is a Nevada Corporation with its principal place of business in

Dallas, Texas.  CW does business in Michigan by and through its wholly owned subsidiaries

offices located at 301 Hoover Boulevard, Suite 100, Holland, Ottawa County, Michigan 49423.

2.      Defendant Ned Timmer ("Timmer") is an individual resident of Cape Coral, Lee

County, Florida and can be served with process in this action at his place of residence at 2018

SE 12th Ter., Cape Coral, Florida 33990.

3.     Defendant JoLee Timmer ("JL Timmer") is an individual resident of Cape Coral, Lee County, Florida and can be served with process in this action at her place of residence at 2018 SE 12th Ter., Cape Coral, Florida 33990.

4.     Defendant Fiona Wicks ("Wicks") is an individual resident of Holland, Ottawa County, Michigan and can be served with process in this action at her place of residence at 2482 Spring Court, Holland, Michigan 49422.

5.     Defendant Peter Lazor ("Lazor") is an individual resident of Summit, Union County, New Jersey and can be served with process in this action at his place of business, Cardinal Points at 23 Edgemont Avenue, Summit, New Jersey 07901.

## II.
## JURISDICTION AND VENUE

6.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because at the time of the filing of this matter, the parties are residents of different states, and the matter in controversy is in excess of $75,000.  Timmer has seized all of the collateral relating to CW's wholly-owned subsidiaries which is not capable of an exact determination of value.  However, its intangible value is well in excess of $75,000, the acquisition as described below was valued at more than $10,000,000 and the bank accounts converted likely have more than $400,000 in cash deposited therein.  The imminent danger of CW's ability to continue meeting its financial obligations under the security agreements in place and operate its businesses as a going concern as a result of the ongoing conduct of Defendants is in excess of the minimum jurisdictional requirement of $75,000.  *See Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.*, 120 F.3d 216, 220 (11th Cir. 1997) ("The plaintiff's claim for monetary damages need not, by itself, exceed the requisite statutory amount because the immediate financial consequences of the litigation to the plaintiff [...] may also be considered

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES**                    **Page 2**

in calculating the amount in controversy."); *see also Leonard v. Enterprise Rent A Car*, 279 F.3d 967, 973 (11th Cir. 2002) ("The value of injunctive or declaratory relief for amount in controversy purposes is the monetary value of the object of the litigation that would flow to the plaintiffs if the injunction were granted.").

7.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because one or more of the Defendants resides in Holland, Ottawa County, Michigan and a substantial part of the events giving rise to the claims occurred in this judicial district.

## III.
## FACTUAL BACKGROUND

### NATURE OF CW'S BUSINESS

8.      CW is currently a marketing and technology services company creating opportunities from the increased accessibility of content across mobile, television and internet platforms. CW's key asset is the patented 611 Roaming Service™ from Ranger Wireless Solutions®, a wholly-owned subsidiary of CW, which generates revenue by processing over 14 million calls from roaming wireless customers per year and seamlessly connects the customers to their applicable service provider's customer service call center while roaming on another carrier's network. CW provides its 611 Roaming Service to many of the large national wireless network/cellular telephone carriers as well as smaller rural and community-based cellular telephone companies.

9.      CW is a publicly traded company on the NASDAQ stock exchange.

### CW'S ACQUISITION

10.     On February 23, 2009, CW completed its acquisition of all of the issued and outstanding equity interests in Woodland Wireless Solutions, Ltd. ("Woodland Wireless"), S Squared, LLC d/b/a Ranger Wireless, LLC ("Ranger"), West Michigan Co-Location Services,

LLC ("West") and T2 TV, LLC ("T2") (collectively the "Acquired Companies") through its newly formed wholly-owned subsidiary, Woodland Holdings Corp.[1] ("Woodland") and pursuant to the terms of the Stock Purchase Agreement[2] entered into on February 23, 2009 by and among Woodland, CW, Timmer and HCC Foundation.

11.     Prior to the acquisition of the interests, Timmer was the sole owner of the equity interests in the Acquired Companies. As stated above, the key asset to be acquired was a patent held by Ranger for the 611 Roaming Service (the "611 Patent"). CW understood that this 611 Patent was exclusively held by S Squared, LLC and that it was the sole provider of the 611 roaming services for the wireless carriers. Believing this to be the case, for purposes of the acquisition, the 611 patent was valued at approximately $10,000,000.

12.     Further, as part of the acquisition Timmer received, among other things $1,575,000 in cash, a Secured Debenture in principal amount of $3,100,000, a secured Purchase Money Note in the principal amount of $4,200,000, an Earn Out Agreement which contemplated contingent payments of $675,000 annually provided certain financial benchmarks were satisfied, warrants to purchase CW common stock, 2,100,000 shares of CornerWorld stock valued at $0.0001 per share, warrants to purchase CornerWorld stock, and an Employment Agreement for his continued employment with Woodland as its Chief Operating Officer ("COO"). Likewise, Timmer became a director on the Board of Directors of CW and Woodland.

13.     In additional to Timmer becoming the COO of Woodland post acquisition, Woodland and the Acquired Companies were structured such that Scott Beck ("Beck") became

---

[1] CW is the sole member and owner of Woodland.

[2] All of the Transaction/Acquisition documents, save for the Employment Agreement, contain a choice of law provision stating that the agreements are governed by the laws of the state of New York.

the Chief Executive Officer ("CEO") and President of all entities as well as the Chairman of the Board of CW, Woodland and Woodland Wireless.

14.     Within the Stock Purchase Agreement certain representations and warranties were made. More specifically, in Section 3.17, it stated that in Schedule 3.17(a), Timmer would list all patents and pending applications for patents for any of the Acquired Companies and in Schedule 3.17(b), Timmer would list all licenses, sublicenses or agreements to all patents held by any of the Acquired Companies. As shown in Schedule 3.17(a)-(j), Timmer disclosed the patent which was assigned to S Squared, LLC to provide the 611 Roaming Service and listed no licenses or agreements involving the listed patent. Similarly, in Section 3.25 and on Schedule 3.25(g), Timmer was required to provide a listing of all Material Contracts, which included licenses to any patents held by the Acquired Companies.

## TIMMER'S UNDISCLOSED PATENT

15.     After the acquisition, CW, through its wholly owned subsidiary, Woodland Holdings, continued to operate all of the Acquired Companies; however, it had encountered some roadblocks with respect to operations of the Acquired Companies as Timmer refused to either perform his duties as outlined in his Employment Agreement and/or to take direction from his superior, Beck, the CEO of Woodland and CW. In particular, and among many other things, Timmer refused to make introductions between Beck and Ranger and/or Woodland Wireless' largest customers and refused to negotiate new contracts with some of the largest customers. Such actions prompted Beck to explore options of how to bring on some of other nationwide wireless carriers.

16.     Beck remembered that pre-acquisition Timmer had explained that in if any other nationwide carrier was providing 611 roaming services for itself, it was in effect "practicing the

patent" and infringing on the patent acquired by CW. Beck found a form cease and desist letter provided to CW pre-acquisition and as part of due diligence and contacted the attorney, Eric Wiemers, who represented Woodland Wireless at the time and had drafted the cease and desist letter for more information and assistance.

17.     In his conversations with Mr. Wiemers, Beck learned that the acquired patent had seven (7) non-exclusive, royalty free licenses to practice the patent that were fully transferable and were valid for the life of the patent. Because of the number of the mergers and acquisitions amongst the wireless telephone carriers, unbeknownst to CW, many of the larger carriers held a license to the patent and did not need to contract with Ranger Wireless for its 611 roaming services.

18.     None of the seven (7) licenses to the patent had been disclosed to CW and upon further review of the Stock Purchase Agreement were noticeably omitted from the schedules attached thereto. No licenses were listed in Schedule 3.17(b) or in Schedule 3.25(g). Importantly, while these licenses were not disclosed as part of the Stock Purchase Agreement, Timmer did sign the Stock Purchase Agreement (which contained sections 3.27 and 8.1) representing that all of the records of the company were true, accurate and complete in all material respects and that all representations made in the agreement were true and accurate. Likewise, Timmer agreed in Section 11.3 that these representations and warranties, including those required to be provided by way of Section 3.17, survived for a period of two (2) years after the closing of the acquisition. Yet, at no point since the closing of the acquisition has Timmer disclosed the existence of the seven (7) licenses to the patent.

19.     In addition to Timmer's failure to disclose the existence of the licenses to the 611 Patent, Timmer's investment banker, Peter Lazor ("Lazor"), who marketed and assisted in

putting together the acquisition, was privy to all material contracts and information relating to the Acquired Companies. In fact, he was so involved in the operations of the Acquired Companies that he was appointed to the Board of Directors of Woodland. Since the acquisition, Lazor has failed to disclose the existence of the seven (7) licenses to CW or Woodland.

20. Likewise, JoLee Timmer ("JL Timmer"), a former executive of the Acquired Companies prior to and during the acquisition of the Acquired Companies and well as Fiona Wicks ("Wicks"), the Controller of Woodland. and the Acquired Companies both before the acquisition and after the acquisition. At no point prior to the acquisition or post acquisition has the existence of the seven (7) 611 Patent licenses been disclosed by JL Timmer or Wicks.

21. Had CW known of the licenses to the key acquired asset, the 611 patent, it would not have entered into the Stock Purchase Agreement with Timmer and purchased the equity interests in the Acquired Companies as it is now clear that the key asset, valued at $10,000,000 is significantly diminished and nearly valueless. Even if CW had known of the seven (7) licenses and had chosen to complete the acquisition, the acquisition most certainly would have not been structured in the same manner either in terms of purchase price, financing and/or rights received by Timmer.

## THE SECURITY AGREEMENTS

22. As stated above, as part of the acquisition, Timmer received cash in addition to a purchase money note and a secured debenture. The Purchase Money Note and the Secured Debenture include sections enumerating what constitutes an "Event of Default." Under the Purchase Money Note, it provides that (1) failure to make a payment within 30 days of the payment, (2) the occurrence of any Event of Default under the Secured Debenture, or (3) the filing of a petition for bankruptcy by or against Woodland. The Purchase Money Note provides

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES**

for a ten (10) cure period. Further, under the Secured Debenture, an "Event of Default" occurs when, among other things, (1) there is any nonpayment of the principal or interest due under the Secured Debenture, (2) CW or Woodland fails to observe or perform any covenant or agreement contained in the Secured Debenture or other Transaction Document[3], (3) any default or event of default occurs under any of the Transaction Documents or other material agreement, (4) any representation or warranty proves to be untrue, or (5) CW or Woodland are subject to a bankruptcy event.

23.     However, the Secured Debenture is quite clear to state that if the "Event of Default" is due to the failure to observe or perform any covenant or agreement contained in the Secured Debenture or other Transaction Document, CW and/or Woodland has 30 trading days to cure the "Event of Default."

24.     Upon the occurrence of an "Event of Default," Timmer, as a secured creditor and/or a secured party to the acquisition, was entitled to certain rights and remedies. In addition to the rights and remedies outlined in the Promissory Note and the Secured Debenture, the Pledge and Security Agreements provided very specific rights and remedies to Timmer. Specifically, Timmer had the right to exercise control over the collateral pledged to Timmer. The "collateral" consisted of, *inter alia*, voting member units, company property, accounts, deposit accounts, equipment, financial assets, inventory, investment property, money, and intangibles. Additionally, the Pledge and Security Agreements provide that in the Event of Default, any or all of the collateral may be registered in the name of the "Secured Party" –

---

[3] "Transaction Documents" include, but are not limited to, the Purchase Money Note, the Secured Debenture, the Earn-Out Agreement, the Employment Agreement, the Lease Agreement, the Unit Purchase Agreement, the Pledge and Security Agreements, and the stock warrants.

Timmer – and that they may thereafter exercise all voting, corporate and other rights pertaining to the collateral.

## ALLEGED DEFAULTS BY CW

25.    On June 16, 2009, Timmer notified Beck as the CEO of CW of alleged "Events of Default." Timmer notified Beck that he had not been paid accrued interest on the Promissory Note or the Debenture as well as several breaches of covenants under the Debenture. Timmer made it clear in his notice letter that CW had 30 days to cure the defaults. Within the 30-day period, CW fully cured any defaults under the Promissory Note and/or Secured Debenture. Since that cure period passed on July 15, 2009, Timmer has received every monetary payment owed to him.

26.    Yet, on December 11, 2009, Timmer sent another notice letter to the CEO claiming (1) there were on-going defaults from those outlined in the June 16, 2009 notice letter, and (2) new defaults had occurred. Significantly, none of the alleged defaults involve the nonpayment of money owed under any Security Agreement to Timmer. Further, instead of providing the required 30-day cure period, Timmer unilaterally claimed that he was exercising his rights under the security agreements and has voted the stock and the membership interests to install new management in Woodland and the Acquired Companies. Timmer made himself the new President and Treasurer of Woodland and Woodland Wireless, and his wife, JL Timmer, the Secretary of both entities. Timmer then instructed Beck that he "no longer [has] the authority to participate in management, check writing, money transfers, or operations of" Woodland or the Acquired Companies. Likewise, the CEO was instructed not to contact any of the employees or customers.

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES**                    **Page 9**

27. Additionally, without any notice to CW, Timmer swept the bank accounts for the Acquired Companies, depositing the cash held therein into an account (the "Timmer Account") which CW had instructed Timmer to close and for which he agreed to close many months earlier. Timmer is the only signer on the Timmer Account. Timmer has also taken the incoming payments from customers and deposited them into the Timmer Account without any notice to CW.

28. In addition to exercising dominion over monies held by CW and/or the Acquired Companies, Timmer has overstepped his bounds as a secured creditor as he failed to provide the requisite 30-day period for CW to cure any alleged defaults before seizing the collateral pledged to him. Timmer exercised his rights to vote stock and appoint new management without registering it in his name, providing notice for a shareholder meeting, or appointing a new board of directors. As such, Timmer's actions are void or voidable.

29. Indeed, as member of the Board of Directors of Woodland and CW, Timmer was well aware that in order to vote the stock (assuming it was properly registered), the Woodland Bylaws require that only the Chairman of the Board may call a special meeting outside of the annual meeting of the stockholders. Moreover, even if he had the power to call a special meeting of the stockholders, he was required to providing a minimum of ten (10) days notice of the stockholders meeting and/or receive the written consent of all stockholders to take action without a meeting. Timmer failed to follow the protocol set forth in the Woodland Bylaws and as such his actions are void or voidable.

## IRREPARABLE HARM TO CW

30. CW, as the sole member and owner of its wholly owned subsidiary Woodland, and as a publicly traded corporation, has a protectable interest in the Woodland's and the

Acquired Company's assets, business operations, customer relations and employees. As a proximate result of the actions described above, including, but not limited to, Timmer's and Wick's conversion of the Acquired Companies' funds and Timmer's pirating of Woodland and the Acquired Companies' business operations, facilities and employees, as well as unilateral and improper institution of himself as the new presiding executive and management of Woodland and the Acquired Companies, CW is suffering a loss of good will, diminution in its stock value, loss of business, inability to operate and honor financial obligations.

31.     Additionally, CW can establish that such conduct is causing or may cause irreparable harm to CW and injunctive relief is warranted. The harm to CW is imminent and continuing because Timmer and/or Wicks has converted all of CW's collateral, the entirety of the business operations, and working capital. The harm to CW described in this Complaint is a proximate result of the intentional acts of Timmer and/or Wicks. CW has no adequate remedy at law for this misconduct, and CW damages are continuing, and are to a large extent intangible. The extent of monetary loss resulting from Timmer's hijack, pirating and/or disruption of all business operations of Woodland and the Acquired Companies and future loss of business is not readily ascertainable as it increases exponentially by the day. Failure to issue immediate relief in terms of ordering Timmer to return and/or freeze Woodland and/or the Acquired Companies' property removed from bank accounts, allow entry to the business premises by CW, and reinstitution of the executives and management structure put in place by the board of directors will permit Timmer and/or Wicks further opportunity to engage in unlawful conduct and further harm CW.

32.     No legal remedy could compensate CW for its loss and threatened loss as a result of Timmer's and Wick's unlawful conduct, prior to a hearing on CW's request for injunctive

---

relief. The mere reimbursement for specific funds and/or business operations lost by CW would not afford CW a complete remedy, because Timmer and/or Wicks would still retain and use CW's collateral and/or the property of Woodland and the Acquired Companies to the businesses' detriment, diminish the value of CW's stock, and unfairly interfere and/or acquire all aspects of the business of CW's wholly owned subsidiaries. CW is suffering, and will continue to suffer, substantial, imminent, and irreparable injury to its business and property as a proximate result of each and all of these illegal acts.

## IV.
## CAUSES OF ACTION

### COUNT I – FRAUD/FRAUDULENT INDUCEMENT

33.     CW incorporates and re-alleges in full the preceding paragraphs of this Complaint.

34.     Defendants made material representations and willfully omitted material facts regarding the value of and/or lack of encumbrances on the 611 Patent to leading up to the closing of the acquisition of the Acquired Companies were required as part of due diligence and in entering into the Stock Purchase Agreement. Defendants likewise, as fiduciaries to CW, Woodland and/or the Acquired Companies, were required to disclose material facts regarding the licenses related to the 611 Patent after the closing of the acquisition on February 23, 2009. Defendants failed to disclose the material facts relating to the seven (7) licenses to the 611 Patent.

35.     Defendants knowing failure to disclose material facts prior to the acquisition and Timmer's material representations during due diligence and in executing the Stock Purchase Agreement stating that there were no licenses to the 611 Patent are false. CW justifiably relied upon the representations and/or material omissions, valued the 611 Patent at $10,000,000 and

completed the acquisition by entering the Stock Purchase Agreement with Timmer. Had CW known of the licenses to the 611 Patent prior to the acquisition, it would not have entered into the Stock Purchase Agreement.

36. Furthermore, the ongoing intentional failure to disclose material facts relating to the business operations relating to, value of and/or usefulness of the "exclusive rights" to the 611 Patent, constitute ongoing fraud by Defendants as CW justifiably relied on these material omissions of fact to forecast revenue, apply for lines of credit and direct future business efforts which are now effectively nullified by the uncovering of the seven (7) licenses to the 611 Patent.

37. Because of Defendants actions, CW has been damaged in excess of the total purchase price of the Acquired Companies.

## COUNT II - BREACH OF CONTRACT (SECURED DEBENTURE)

38. CW incorporates and re-alleges in full the preceding paragraphs of this Complaint.

39. Timmer is bound by the valid terms of the Secured Debenture. Timmer agreed that upon an "Event of Default" of any covenant of the Secured Debenture and/or any of the Transaction Documents, he would permit CW and/or Woodland a 30-day cure period. Timmer has failed to provide the 30-day cure period before exercising his rights and remedies under the Secured Debenture.

40. Timmer's breach of the Secured Debenture has directly and proximately caused, and unless enjoined will continue to cause, irreparable harm for which there exists no adequate remedy at law, as well as cause damages to CW in excess of the minimum jurisdictional requirement of this Court.

## COUNT III - BREACH OF CONTRACT (PURCHASE MONEY NOTE)

41.     CW incorporates and realleges in full the preceding paragraphs of this Complaint.

42.     Timmer is bound by the valid terms of the Purchase Money Note. Timmer agreed that upon an "Event of Default" of the Purchase Money Note, he would permit CW and/or Woodland a 10-day cure period. Timmer has failed to provide the 10-day cure period before exercising his rights and remedies under the Secured Debenture.

43.     Timmer's breach of the Purchase Money Note has directly and proximately caused, and unless enjoined will continue to cause, irreparable harm for which there exists no adequate remedy at law, as well as cause damages to CW in excess of the minimum jurisdictional requirement of this Court.

## COUNT IV - BREACH OF CONTRACT (PLEDGE AND SECURITY AGREEMENT)

44.     CW incorporates and realleges in full the preceding paragraphs of this Complaint.

45.     Timmer is bound by the valid terms of the Pledge and Security Agreement. Timmer agreed that upon an "Event of Default" that in order to exercise the voting corporate and/other right to collateral, such as the membership interests or stock of Woodland, he must register the stock in his name. Assuming a proper vote could be held to institute new management and/or officers, Timmer failed to properly register the collateral in his name prior to exercising voting rights. As such he breached the Pledge and Security Agreement.

46.     Timmer's breach of the Pledge and Security Agreement has directly and proximately caused, and unless enjoined will continue to cause, irreparable harm for which there exists no adequate remedy at law, as well as cause damages to CW in excess of the minimum jurisdictional requirement of this Court.

## COUNT V - BREACH OF FIDUCIARY DUTY (TIMMER)

47. CW incorporates and realleges in full the preceding paragraphs of this Complaint.

48. As a member of the Board of Directors of CW and Woodland, as well as the COO, Timmer had and continues to have continuing fiduciary duties of loyalty, good faith and to act in the best interest of CW and Woodland. Timmer has breached his fiduciary duties by failing to disclose and continuing to hide the material fact regarding the existence of the seven (7) licenses to the 611 patent.

49. As a result of Timmer's actions, CW has suffered damages in excess of the minimum jurisdictional requirement of this Court and has suffered irreparable harm.

## COUNT VI - BREACH OF FIDUCIARY DUTY (WICKS)

50. CW incorporates and realleges in full the preceding paragraphs of this Complaint.

51. As current employee of Woodland, and controller of Woodland and the Acquired Companies, Wicks had and continues to have continuing fiduciary duties of loyalty, good faith and to act in the best interest of CW and Woodland. Wicks has breached her fiduciary duties by failing to disclose and continuing to hide the material fact regarding the existence of the seven (7) licenses to the 611 patent. Wicks has also breached her fiduciary duties by acting in concert with Timmer and/or for her own personal benefit to sweep and/or convert the monies held in the bank accounts of the Acquired Company to the detriment of CW and its ongoing financial obligations and duties of its stockholders.

52. As a result of Wick's actions, CW has suffered damages in excess of the minimum jurisdictional requirement of this Court and has suffered irreparable harm.

## COUNT VII - BREACH OF FIDUCIARY DUTY (LAZOR)

53. CW incorporates and realleges in full the preceding paragraphs of this Complaint.

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES**     **Page 15**

54. As a member of the Board of Directors of Woodland, Lazor had and continues to have continuing fiduciary duties of loyalty, good faith and to act in the best interest of CW and Woodland. Lazor has breached his fiduciary duties by failing to disclose and continuing to hide the material fact regarding the existence of the seven (7) licenses to the 611 patent.

55. As a result of Lazor's actions, CW has suffered damages in excess of the minimum jurisdictional requirement of this Court and has suffered irreparable harm.

## COUNT VIII - CONVERSION

56. CW incorporates and realleges in full the preceding paragraphs of this Complaint.

57. As described above, CW is the sole member of and 100% owner of its wholly-owned subsidiary Woodland. As such, it is the owner of all property and/or collateral held by its wholly-owned subsidiary and the Acquired Companies. Timmer has knowingly or intentionally, with malice and without authorization by CW, assumed dominion and control over CW's property and/or collateral and exercised the right of ownership to such property and collateral including, but not limited to the monies contained in the bank accounts of the Acquired Companies.

58. Likewise, Wicks has Timmer has acted in concert with and/or knowingly or intentionally, with malice and without authorization by CW, assumed dominion and control over CW's property and exercised the right of ownership to such property including, but not limited to the monies contained in the bank accounts of the Acquired Companies.

59. Timmer and Wick's conversion of CW's property and/or collateral has caused and, unless enjoined, will continue to cause CW irreparable harm for which there exists no adequate remedy at law. In addition, such conversion has otherwise damaged CW in excess of the minimum jurisdictional limits of the court.

## COUNT IX - VIOLATIONS OF THE MICHIGAN AND/OR NEW YORK UNIFORM COMMERCIAL CODE[4]

60. CW incorporates and realleges in full the preceding paragraphs of this Complaint.

61. As a secured creditor, Timmer and the debtor, CW and/or Woodland, must act in accordance with the Uniform Commercial Code ("UCC").

62. Timmer has violated numerous sections of the UCC. More specifically, Timmer has violated Section 1-203 of the New York UCC and 440.1203 of the Michigan UCC, by failing to act in good faith on his enforcement of his creditor's rights in both sweeping the cash from the bank accounts of the Acquired Companies and improperly exercising membership and voting rights.

63. Timmer has violated Section 9-609 of the New York UCC and Section 440.9609 of the Michigan UCC when he took possession of the collateral without judicial process and in breach of the peace. Timmer did not seek a court order deeming his seizure of the collateral proper and he breached the peace when he swept the bank accounts and effectively rendered CW unable to honor its continuing financial obligations.

64. Furthermore, Timmer's actions violated Section 9-207 of the New York UCC and Section 440.9207 of the Michigan UCC when he failed to exercise reasonable care to preserve the collateral and value of the collateral by sweeping the cash accounts and unilaterally appointing new officers and management at Woodland and the Acquired Companies.

65. Likewise simply because Timmer, as a secured creditor seized the collateral, including the membership interests and stock, the seizure did not convey ownership of the stock to Timmer. As such to own the stock and properly exercise stockholder voting rights Timmer

---

[4] The agreements at issue provide for New York as the governing law; however, some of the actions are not necessarily governed by the parties' agreements, as such the Michigan Uniform Commercial Code may apply.

was required to dispose of the collateral by public or private sale. By failing to properly notify CW of the disposition of the collateral and/or dispose of the collateral to convey ownership, Timmer has violated Sections 9-610 and 9-611 of the New York UCC and 440.9610 and 440.9611 of the Michigan UCC.

66. As a result of Timmer's violations of the UCC, CW has and continues to suffer irreparable harm and damages in excess of the minimal jurisdictional requirements of this Court.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

67. CW incorporates and re-alleges in full the preceding paragraphs of this Complaint.

68. By reason of Timmer and Wick's unlawful conduct outlined above, CW has and will continue to suffer irreparable injury, for which there is no adequate remedy at law. This injury is imminent and ongoing, in that Timmer and/or Wicks are in possession of CW's businesses, collateral and/or property, including fund contained within the Acquired Companies' bank accounts, and are using, or have the opportunity to use, the business, collateral or property for their own benefit and/or intentionally to the detriment of CW.

69. CW requests that a Temporary Restraining Order be entered ordering Timmer and Wicks and those persons and entities in active concert or participation with them:

> (a) to preserve and return all CW collateral and/or property, including, but not limited to, the funds contained with the bank accounts of the Acquired Companies within three (3) days from the date the Temporary Restraining Order is signed; and
>
> (b) be prohibited from interfering with the business operations of Woodland and/or the Acquired Companies, including refraining from contacting employees and customers and from entering the business premises.

---

70.     And to order that:

   (a)    CW be allowed to enter the business premises of Woodland and the
          Acquired Companies;

   (b)    CW be permitted to continue the operation of the businesses of Woodland
          and the Acquired Companies; and

   (c)    That the officers and directors as of December 10, 2009, are still employed
          and/or hold positions on the Woodland and/or the Acquired Companies'
          board of directors.

71.     CW also seeks a Preliminary and Permanent Injunction decreeing that Timmer

and Wicks those persons and entities in active concert or participation with him:

   (a)    to preserve and return all CW collateral and/or property, including, but not
          limited to, the funds contained with the bank accounts of the Acquired
          Companies within three (3) days from the date the Temporary Restraining
          Order is signed; and

   (b)    be prohibited from interfering with the business operations of Woodland
          and/or the Acquired Companies, including refraining from contacting
          employees and customers and from entering the business premises.

72.     And to order that:

   (a)    CW be allowed to enter the business premises of Woodland and the
          Acquired Companies;

   (b)    CW be permitted to continue the operation of the businesses of Woodland
          and the Acquired Companies; and

   (c)    That the officers and directors as of December 10, 2009, are still employed
          and/or hold positions on the Woodland and/or the Acquired Companies'
          board of directors.

73.     CW requests that the Court schedule a Preliminary Injunction hearing, ordering

Timmer and Wicks to appear and show cause why the above-requested injunctive relief should

not be made the subject of a Preliminary Injunction, pending a trial on the merits.

74.     CW requests that following an evidentiary hearing, a Preliminary Injunction be

entered, ordering and enjoining Timmer and Wicks, and those persons in active concert or

participation with him, from engaging in the conduct set forth in paragraphs 71 and 72 of the Complaint, and/or such other relief that the Court may deem necessary at the conclusion of the evidentiary hearing. If such relief is not granted, CW will suffer irreparable harm before a trial on the merits of this case can be conducted. CW has no adequate remedy at law. For these reasons, CW seeks the issuance of a preliminary injunction following an evidentiary hearing.

75.    CW further requests that, following a trial on the merits, the Court enter a Permanent Injunction enjoining Timmer and Wicks from the above described acts.

## ATTORNEYS' FEES

76.    This action is based in part on Timmer's breach of contract. Because of Timmer's unlawful conduct, CW has been forced to retain the undersigned counsel to protect its legal rights and prosecute this action on its behalf. CW is entitled to be awarded in this action all its reasonable and necessary attorney's fees and costs incurred and that may be incurred at all court levels.

## V.
## PRAYER FOR RELIEF

Plaintiff CornerWorld Corporation prays for judgment against Defendants Ned Timmer, JoLee Timmer, Fiona Wicks and Peter Lazor as follows:

a.    that the Court issue a Temporary Restraining Order against Defendant(s);

b.    that Defendant(s) be cited to appear at an evidentiary hearing and show cause why a Preliminary Injunction should not be issued according to the terms requested herein;

c.    that the Court, upon hearing, enter a Preliminary Injunction, thereafter to be made permanent;

d.    that Plaintiff have judgment against Defendants for actual damages;

e.    that Plaintiff have judgment against Defendant(s) for its attorneys' fees, costs of

court and prejudgment and postjudgment interest as allowed by law; and,

      f.     that Plaintiff recover such additional relief, at law or in equity, to which it may be

justly entitled.

                         Respectfully Submitted,

                         MILLER JOHNSON
                         Attorneys for Plaintiff

Dated: December 14, 2009      By

                         David J. Gass (P34582)
                         Business Address:
                              250 Monroe Avenue, N.W., Suite 800
                              PO Box 306
                              Grand Rapids, Michigan 49501-0306
                         Telephone: (616) 831-1700

OF COUNSEL:

Ronald M. Gaswirth*
Texas State Bar No.
Barry M. Golden
Texas State Bar No.
Sarah E. Bradbury*
Texas State Bar No. 24041327

GARDERE WYNNE SEWELL LLP
1601 Elm Street
3000 Thanksgiving Tower
Dallas, Texas 75201
Ph: (214) 999-3000
Fax: (214) 999-4667
rgaswirth@gardere.com
bgolden@gardere.com
sbradbury@gardere.com

## ATTORNEYS FOR PLAINTIFF CORNERWORLD CORPORATION

*Application for Admission Pro Hac Vice to be filed*

GR_DOCS 1540224v1