UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORNERWORLD CORPORATION,

    Plaintiff,

v.

NED TIMMER, et al.,

    Defendants

File No. 1:09-CV-1124

HON. ROBERT HOLMES BELL

and

NED TIMMER, et al.,

    Plaintiffs,

v.

CORNERWORLD CORPORATION, et al.,

    Defendants.
_____/

File No. 1:09-CV-1131

# **O P I N I O N**

This matter comes before the Court on cross-motions for a preliminary injunction filed in two related cases. For the reasons that follow, the Court will grant the motion for preliminary injunction in *CornerWorld Corp. v. Timmer*, File No. 1:09-CV-1124, and deny the motion for preliminary injunction in *Timmer v. CornerWorld Corp.*, File No. 1:09-CV-1131.

**I.**

The cross-motions for preliminary injunction relate to who should manage the operations of certain businesses pending a trial on the merits. The Court held an evidentiary hearing on the cross-motions for preliminary injunction on December 21, 2009, at which time the Court received documentary evidence presented by the parties and listened to the testimony of Scott Beck ("Beck") and Ned Timmer ("Timmer). This opinion sets forth the reasons for the Court's rulings on the preliminary injunctions requested.

CornerWorld Corporation ("CornerWorld") is a publicly-traded marketing and technology services company incorporated in Nevada, with offices in Dallas, Texas. CornerWorld provides mobile telephone, television, and internet services. Scott Beck ("Beck") is the CEO of CornerWorld.

Timmer is a Florida resident who used to reside in Holland, Michigan. Prior to February 23, 2009, Timmer owned West Michigan Co-Location Services, LLC, T2 TV, LLC, S Squared LLC (d/b/a Ranger Wireless"), and Woodland Wireless Solutions, Ltd. (collectively, the "Subsidiary Companies"). The Subsidiary Companies were involved in the telecommunications business and operated out of Holland, Michigan.

On February 23, 2009, Timmer sold his interests in the Subsidiary Companies to CornerWorld's newly-formed and wholly-owned subsidiary, Woodland Holdings Corp. ("Woodland Holdings"). The purchase price was $12.2 million, which included $1.9 million in cash, a secured debenture for $3.1 million, a purchase money note for $4.2 million, an

earn-out agreement, and a stock purchase agreement. Timmer was also granted a security interest in the stock and membership interests of CornerWorld and its subsidiaries.

Following the February 23, 2009, transaction, CornerWorld became the owner of Woodland Holdings and the four Subsidiary Companies. Beck continued to serve as CEO of CornerWorld, and became the CEO of the Subsidiary Companies. Timmer became the COO of Woodland Holdings and a director on the Board of CornerWorld and Woodland Holdings. Timmer managed the Holland offices of the Subsidiary Companies.

On June 16, 2009, Timmer sent CornerWorld a notice of default. The main default claimed in the letter was the failure to pay interest on the Note and Debenture. The letter also gave notice of the following additional breaches of covenants that, if not cured within 30 days, would constitute defaults: (1) engaging in material new businesses (rural telephone company, Tiny Dial short code clearinghouse) through Enversa without Timmer's consent or Board approval, (2) failing to employ a CFO or COO satisfactory to Timmer, (3) failing to add an independent director satisfactory to Timmer, (4) failing to provide Timmer internet access to bank accounts for review purposes, (5) removing cash and diverting business from Woodland Wireless, (6) transferring cash to CornerWorld without a budget or Timmer's approval, and (7) increasing Beck's compensation without Timmer's consent or Board approval. Timmer also raised a general objection to CornerWorld's failure to follow normal

business practices, such as adopting a budget, adopting a business plan, and passing resolutions. (CW Ex. 5, 06/16/2009 letter from Cunningham Dalman PC to Beck.)[1]

CornerWorld immediately paid Timmer all of the money to which Timmer was entitled. In addition, the June 16, 2009, letter was also placed on the agenda for the following Board of Directors meeting on August 3, 2009. (CW Ex. 25.) At the August 3 Board of Directors meeting Beck read through the budget. (Ex. 16, Minutes at 10-11, 08/03/2009 Minutes.) Although there is no reference in the minutes to a motion to approve the budget, the minutes of the August 27, 2009, Board meeting reference the adoption of the budget at the August 3 meeting. (*Id.* at 12, 08/27/2009 Minutes.)

Both Timmer and Beck attended weekly management meetings and monthly Board of Directors meetings, either in person or by telephone. There is no evidence that Timmer made any suggestions at any of the Board meetings or management meetings after August 3, that there were any outstanding defaults.

A key asset CornerWorld obtained in the purchase was a 611 roaming-service patent owned by S Squared (the "611 patent"). CornerWorld valued this asset at $10 million based on its capacity to generate revenue through contracts with major cellular telephone carriers such as Verizon/Alltel and Sprint, and on CornerWorld's understanding that S Squared had the exclusive right to use the patent. Beck testified that on December 7, 2009, he learned for

---

[1]CornerWorld's exhibits will be designated "CW Ex. ___," and Timmer's exhibits will be designated "Timmer Ex. ___." Where both parties have the provided the same documents, the Court will cite only the CornerWorld exhibit number.

the first time that Timmer had failed to disclose to CornerWorld the existence of seven licenses for the 611 patent despite the fact that the Stock Purchase Agreement required Timmer to disclose "all licenses" involving the intellectual property of the Subsidiary Companies and all material contracts to which the Subsidiary Companies were parties. (CW Ex. 3, Stock Purchase Agrm't §§ 3.17(b), 3.25(g), Ex. 4, Schedules at 15, 18.) Timmer acknowledged that he became aware of three outstanding licenses by virtue of his involvement in *S Squared v. Cingular*, No. 1:04-CV-647 (W.D. Mich.). However, in Timmer's opinion, the outstanding licenses were not material.

On December 10, 2009, Timmer unilaterally determined that CornerWorld had not cured the defaults and exercised his rights as a secured creditor holding all of the outstanding stock of Woodland Holdings and the Subsidiary Companies to vote the stock and the membership interest to install himself as director and manager of Woodland Holdings and the Subsidiary Companies. (CW Ex. 6, 12/11/2009 Letter from Cunningham Dalman PC to Beck.) He also moved all of the money from the Woodland Holdings account at Comerica Bank to an account at Paragon Bank to which CornerWorld did not have access. Timmer, through his attorneys, advised in a letter dated December 11, 2009, that the defaults outlined in the June 2009 letter continued, including, but not limited to, (1) CornerWorld's continued diversion of funds from Woodland Holdings and the Subsidiary companies without Timmer's approval; (2) CornerWorld's failure to obtain a control agreement with Comerica Bank; and (3) the startup of the Tiny Dial business as part of Enversa. (*Id.*)

On December 14, 2009, CornerWorld filed an action against Timmer and others[2] alleging breach of contract, breach of fiduciary duty, and conversion. CornerWorld's complaint seeks damages and an injunction requiring Timmer to return the assets over which Timmer had exerted control, prohibiting Timmer from interfering with the business operations of Woodland Holdings and its subsidiaries, and declaring null and void Timmer's corporate actions of December 10, 2009, that were designed to gain corporate control over Woodland Holdings and its subsidiaries. *CornerWorld v. Timmer*, File No. 1:09-CV-1124.

On December 15, 2009, Timmer, Woodland Holdings, and the Subsidiary Companies filed an action against CornerWorld and Beck, seeking a declaration that a default exists and seeking an injunction prohibiting Defendants from interfering with the bank accounts and business operations of the companies. *Timmer v. CornerWorld*, File No. 1:09-CV-1131. The defaults alleged are the failure to obtain a control agreement with Comerica Bank, the transfer of funds among affiliates without Timmer's approval, and Enversa's undertaking of the new Tiny Dial business venture without Timmer's approval. *Id.*, Dkt. No. 1, Compl. at ¶ 25.

## II.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)

---

[2]The other defendants in this action are Jolee Timmer, Fiona Wicks, and Peter Lazor.

(citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).  In determining whether to grant a preliminary injunction, the Court considers the following:

> (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001).  These four considerations are "factors to be balanced, not prerequisites that must be met."  *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).

**A. Likelihood of Success on the Merits:**

The likelihood of either party's success on the merits centers around the issue of whether Timmer properly exercised his rights under the relevant agreements in response to events of default.  The Court will consider the three events of default raised in both Timmer's complaint and the December 11, 2009, letter.

1. Control Agreement

The Collateral Perfection Agreement requires CornerWorld to enter into a Control Agreement for each bank account in which Timmer has a security interest within 30 days of the February 23, 2009, Agreement.  (CW Ex. 11, ¶ 2.)  To date, CornerWorld has not obtained a Control Agreement with Comerica Bank.

CornerWorld contends that the failure to perform any covenant or agreement in the Debenture or any other Transaction Document other than the payment of principal or interest

7

does not constitute an event of default unless it is not cured within thirty trading days after notice of such failure. (CW Ex. 8, Secured Debenture § 6(a)(i), (ii).) CornerWorld contends that its failure to obtain a control agreement is not an event of default because it was not listed in the June 16, 2009, letter, and CornerWorld has not been given notice and an opportunity to cure.

The Secured Debenture also defines an event of default to mean a default under any of the Transaction Documents, without regard to notice and an opportunity to cure. (*Id.* at § 6(a)(iii).) The Collateral Perfection Agreement is a Transaction Document that placed an affirmative obligation on CornerWorld to obtain a control agreement within 30 days. Timmer was not required to give CornerWorld notice of its failure to meet this obligation under the Transaction Documents. The Court is accordingly satisfied that CornerWorld's failure to obtain a control agreement was an event of default. Nevertheless, the Court finds that the default was not material. A Control Agreement "constitutes an authenticated record that the bank at which Debtors have a deposit account will comply with instructions originated by Secured Party directing disposition of the funds in the deposit account without further consent by the Debtors." (CW Ex. 11, Collateral Perfection Agreement ¶ 2.) Timmer acknowledged that CornerWorld gave him access to its bank account at Comerica, and Timmer's action in transferring the money from that account to an account at Paragon Bank indicates that he was able to accomplish what the Control Agreement was designed to enable him to do. Accordingly, while the lack of a Control Agreement is an event of default, it was

not a material default.

2. Transfer of Funds Among Affiliates without Timmer's Approval

Timmer alleges that CornerWorld is in default because it has continued to transfer funds among the affiliates without Timmer's approval. Specifically, Timmer testified that he objects to the transfer of funds from Woodland Wireless to CornerWorld without his consent.

Section 5 of the Secured Debenture provides:

(m) other than as set forth on a budget agreed upon by Woodland and Holder, it shall not, and it shall cause each Subsidiary not to, transfer cash to any Affiliate, without Holder's prior written consent.

(CW Ex. 8, Secured Debenture § 5(m).)

Beck testified that a budget was adopted at the August 3 board meeting and that all payments have been within that budget. The budget provides for CornerWorld to have $91,000 per month in operating expenses. (CW Ex. 17, p. 4.) Beck further testified that of 82% of the $2.6 million, or almost $2.2 million, that was transferred since the acquisition was for the benefit of Timmer. (CW Ex. 19.) Those transfers included payments directly to Timmer, and payments to IU, the company that loaned the $1.9 million CornerWorld used to pay Timmer.

Timmer testified that he did not object to the transfer of the funds that were transferred for his benefit. He testified that he was concerned about the remaining $480,000 that was transferred to CornerWorld for CornerWorld's operations.

9

Under the Secured Debenture, if the payments were made pursuant to a budget agreed upon by Woodland and Timmer, Timmer's prior written consent was not required. Timmer's objections to the transfers accordingly assume the lack of an agreed-upon budget.

CornerWorld does not have a corporate resolution or a minute entry indicating that a vote was taken to adopt the budget. However, Beck believed the budget had been adopted, and the minutes reflect that the budget was discussed, and that McCrea, the CFO, understood that the budget had been adopted. Moreover, it appears that business was conducted on the assumption that the budget had been adopted. Timmer testified to his understanding that CornerWorld did not generate revenue and that it would have to depend on the Subsidiary Companies and Enversa for operating expenses. Timmer agreed that the Subsidiary Companies generated far more revenue than Enversa and that they would have to fund CornerWorld. Timmer did not present any evidence to suggest that the $91,000.00 reflected in the budget for CornerWorld's operating expenses was unreasonable or that the average of $48,000 per month actually transferred to CornerWorld for its operating expenses was unreasonable. There is no evidence that Timmer objected to the lack of a budget at any time after August 3. His silence against the background of the other evidence suggests that a budget was adopted, and that CornerWorld's transfer of funds without Timmer's approval was not an event of default.

3. Enversa's Tiny Dial Business

Evidence was produced that Enversa purchased a patent for the right to route short codes, and that it is involved in starting up a new company called Tiny Dial. Enversa is a subsidiary of CornerWorld, and is the sales and marketing arm of the company. Tiny Dial is in start-up mode and is not yet operational.

Timmer contends that Enversa's Tiny Dial business violates the following covenant in the Secured Debenture:

> "it shall not engage in any material business other than the business it is engaged in at the Original Issue Date or any activities directly related thereto.

(CW Ex. 8, Secured Debenture § 5(e).)

The term "it" as used in § 5(e) refers to each "Issuer." (*Id.* at § 5.) "Issuers" are defined as Woodland Holdings and CornerWorld. (*Id.* at p. 1.) CornerWorld contends that the term "Issuer" does not cover CornerWorld or Woodland Holding's affiliates or subsidiaries, and does not apply to Enversa's activities.

The Secured Debenture expressly refers to affiliates or subsidiaries when their conduct is at issue. (*See*, *e.g.*, *id.* at § 5(f) ("it shall not, nor shall it permit any Subsidiary to . . . ."); and *id.* at § 5(m) ("it shall not, and it shall cause each Subsidiary not to . . . .") Accordingly, because Tiny Dial is the business of a subsidiary of CornerWorld, and not the business of CornerWorld itself, it does not appear to be subject to this covenant.

Timmer essentially conceded during his testimony that he does not have the right to control Enversa's activities. He indicated that his real concern was that Enversa had used or

11

would be using Woodland Wireless's employees to accomplish the technical aspects of its business, to the detriment of Woodland Wireless.

Based upon the evidence presented to date, it appears to the Court that CornerWorld has a far stronger likelihood of success on the merits of its action than does Timmer. Timmer has not shown a material breach of the Agreements that would justify his resort to the drastic and draconian measures he took to protect his interests.

**B. Irreparable Harm**

Both parties contend that they will be irreparably harmed if a preliminary injunction is not issued in their favor. Both Timmer and CornerWorld will potentially be harmed if Woodland Holdings does not survive. The parties have differing opinions as to how best to insure its survival. CornerWorld is concerned that if it is not in control of the companies, it will not be able to meet its bills and negotiate contracts. Timmer is concerned that CornerWorld is not operating in the best interests of Woodland Holdings and the Subsidiary Companies.

**C. Harm to Others and Public Interest**

These lawsuits primarily concern a private issue, but because CornerWorld is publicly held, they do raise issues that go beyond the immediate parties. Moreover, the Court finds that the public has an interest in insuring that the strong self-help remedies for secured parties are not used unless they are truly justified and essential.

Timmer's concern with the manner in which the Subsidiary Companies' resources are

used is representative of his failure to relinquish control over his companies after their sale. It appears to the Court that the Buy/Sell Agreements are drafted on the assumption that the CEO (Beck) and the COO (Timmer) will be able to work together. However, the evidence that is emerging reflects that there are substantial disagreements between Beck and Timmer as to how the businesses are to be run in the future. There is a collision over management styles, and that collision has undoubtedly become insurmountable in light of Timmer's unilateral and drastic actions in this case. It appears to the Court that where, as here, the buyer and seller have shown an inability to work together, it is the buyer management viewpoint must prevail.

The Court finds that it is necessary to separate Timmer from the day-to-day management of the Subsidiary Companies, while at the same time allowing him to remain on the Board of Directors.

The Court will accordingly enter a preliminary injunction as follows:

1. The actions taken by Timmer on December 10, 2009, to gain corporate control over Woodland Holdings and the Subsidiary Companies are deemed null and void.

2. Timmer and Fiona Wicks and all those persons and entities in active concert or participation with them shall return to CornerWorld all collateral and/or property belonging to CornerWorld over which they have asserted dominion and control, including, but not limited to, the funds contained in CornerWorld's Comerica bank accounts and all other funds received by them since December 10, 2009.

3. CornerWorld and Beck and all those persons and entities in active concert or participation with them shall undo all actions they have taken since December 10, 2009, to assert dominion and control over entities still owned by Timmer. (*See* Timmer Ex. 13, at 6.)

4. CornerWorld shall immediately set up bank accounts in Holland Michigan with proper Control Agreements.

5. Timmer shall be removed from active management of the Holland employees, but shall be retained on the Board of Directors of CornerWorld as provided in the Buy/Sell Agreements.

Security is not required because Timmer is adequately protected by his secured interests in Woodland Holdings and the Subsidiary Companies.

Finally, the Court understands that resolution of this complicated and dynamic business relationship will be difficult. The Court believes that it may be appropriate to appoint a special master. Accordingly, the Court invites the parties, pursuant to Rule 53(b) of the Federal Rules of Civil Procedure, to be heard on the issue of a master and to suggest candidates for appointment. Briefs on the issue of the appointment of a master and/or names of candidates for appointment shall be filed within 30 days.

An order consistent with this opinion will be entered.


Date:   December 22, 2009              /s/ Robert Holmes Bell
                                                     ROBERT HOLMES BELL
                                                     UNITED STATES DISTRICT JUDGE