UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CORNERWORLD CORPORATION,

       Plaintiff,

                                  File No.  1:09-CV-1124

v.

                                  HON. ROBERT HOLMES BELL

NED TIMMER,

       Defendant.

_____/


# **O P I N I O N**

On September 10, 2010, the Special Master filed his First Dispute Resolution Recommendation, recommending that the Court make certain findings regarding the relocation of switching equipment and the compensation of Plaintiff's chief financial officer. (Dkt No. 96, Recommendation.) This matter is before the Court on Defendant Ned Timmer's objections to the Recommendation and his incorporated motion for preliminary injunction. (Dkt. No. 99, Obj.).  Plaintiff CornerWorld has filed a response to those objections and the motion for preliminary injunction. (Dkt. No. 104.)  For the reasons that follow, the Court adopts the Special Master's recommendation in part and denies Defendant's motion for preliminary injunction.

## **A.  Relocation of Switching Equipment**

Defendant Ned Timmer contends that CornerWorld defaulted under the Transaction Documents by moving switching equipment to Texas.  The Special Master recommended that

the Court make a finding that Plaintiff's relocation of the switching equipment from Michigan to Texas is not an event of default. The Special Master further recommended that the Court expand the preliminary injunction to prohibit Defendant from taking any action to prevent the relocation of the switching equipment.

Defendant objects to both the process used and the recommendations made by the Special Master. Defendant also requests the Court to schedule a hearing and to enter a preliminary injunction enjoining Plaintiff from moving the switching equipment from Michigan to Texas.

Defendant's procedural objection is based on his contention that the Special Master consulted with Plaintiff and its experts, but failed to consult with Defendant about the costs and risks of moving the equipment before entering his recommendation with respect to the switching equipment. Defendant contends that this procedure was unfair and put him at a great disadvantage.

Defendant does not contend that he had no opportunity to present his position to the Special Master. Rather, Defendant complains that he did not have an opportunity to address the Special Master after the Special Master consulted with Plaintiff's engineers. Defendant contends that he should have had an opportunity to rebut the analyses offered by Plaintiff's engineers regarding the costs and risks associated with moving the switches to Texas.

The Court appointed the Special Master to serve as arbiter of issues involving compliance with the transaction documents pending trial in accordance with the parties'

agreement.  (Dkt. No. 25, Pl.'s Br. re Sp. Master; Dkt. No. 29, Def.'s Br. re Sp. Master;Dkt. No. 43, Order Appointing Sp. Master.)  The Court did not specify the procedures to be followed by the Special Master.  The Court relies on the Special Master to undertake such investigations and to utilize such procedures as he deems necessary.  Even if Defendant was denied an opportunity to rebut Plaintiff's evidence, Defendant can bring those matters to the Court's attention through his objections to the Recommendation, as he has done here.  This process as a whole is not unfair.

Defendant also objects to the Special Master's recommended finding that removal of the switching equipment to Texas is not an event of default under the Debenture.  Defendant contends that moving the equipment would have a material adverse effect both on the enforceability of the Transaction Documents and on the operations of S-Squared, LLC and T2 TV, LLC, the subsidiary companies.[1]

Defendant contends that moving the switching equipment will have a materially adverse effect on the enforceability of the transaction documents because the switching

---

[1]The Secured Debenture defines an event of default to include any event "that has, or could reasonably be expected to have, a Material Adverse Effect."  (Dkt. No. 8, Ex. 2, Sec. Deb. § 6(a)(x).)  "Material Adverse Effect" is defined to include:

> an effect that results in or **causes, or could reasonably be expected to result in or cause, a material adverse effect on** (a) the legality, validity or **enforceability of any Transaction Document**, (b) the results of **operations**, assets, business or condition (financial or otherwise) **of the Issuers and the Subsidiaries**, taken as a whole . . . .

*Id.* at § 1 (emphasis added.)

equipment represents a significant portion of the value of the collateral, and moving the equipment would have a materially adverse effect on Defendant's ability to enforce his rights and remedies under the Secured Debenture. Specifically, Defendant points out that moving the equipment eliminates Defendant's ability to resell the business as a turn-key operation, and hampers Defendant's ability to repossess the equipment in the event of a default.

The Special Master found: (1) that there was no provision in any of the operative sales documents that prohibits the equipment from being moved out of Michigan; (2) that, had the parties intended moving the collateral to be an event of default, they would have included it in the transaction documents because, based on his experience, such prohibitions are standard boiler plate provisions in security agreements; and (3) that despite some inconvenience, Defendant's security interest in the equipment continues to be enforceable. Based upon these findings, the Special Master concluded that Defendant failed to meet his burden of proving that moving the equipment was a materially adverse event. Defendant has not challenged these findings. Defendant nevertheless objects to the Special Master's conclusions based on his contention that the Special Master failed to consider the impact that moving the equipment would have on the enforceability of his security agreements.

Contrary to Defendant's assertions, the Special Master did consider the impact of moving the equipment on the enforceability of the security agreements. The Special Master specifically acknowledged that repossession may be more inconvenient, but noted that the Debenture does not provide that a default results from a material "inconvenience" in

exercising the secured party's rights and remedies under the Debenture. Because Defendant sold the businesses to a Texas operation and did not insert any language in the sales documents requiring that the businesses or the equipment stay in Holland, it is reasonable to find that the movement of the equipment to Texas is not an event of default. Defendant has not alerted the Court to any language in the transaction documents that would support a finding of default based upon the inconvenience of repossession. The Court finds nothing in Defendant's response that would cast doubt on the Special Master's legal conclusion that moving the equipment is not a "materially adverse event" under the enforceability prong of the Secured Debenture's definition of "Material Adverse Effect."

Defendant also contends that moving the switching equipment would have a materially adverse effect on the operations of the subsidiary companies. First, Defendant challenges the Special Master's finding that moving the switching equipment will generate a cost savings. Defendant has presented evidence that, despite the more beneficial terms of the XO Communications lease, CornerWorld is still obligated to pay on a three-year lease in Holland that commenced in February, 2009. (Dkt. No. 100, Ex. 12, Lease.)

Although the Court is not privy to all of the facts and figures considered by the Special Master, its is beyond dispute that the Special Master was aware of the Holland lease. The Special Master specifically noted that the projected annual savings took into consideration the rent which continues to be paid on the building in Holland. (Recommendation 4.) Plaintiff has presented evidence that the cost savings estimate was

based not only on a lower rent at XO, but also on a personnel reduction at the Holland facility and future savings when CornerWorld exercises its option under the lease agreement to purchase the Holland facility.  (Dkt. No. 104, Beck Aff. ¶ 4.)

Second, Defendant contends that moving the primary switch creates a considerable risk to operations because, during the time that the primary switch is being moved to Texas, S-Squared will be operating with only the back-up or "lab" switch.  Defendant has presented evidence that, unlike the primary switch which has two hard drives, the lab switch has only a single hard drive.  Accordingly, if there is a failure in the back-up switch hard drive, he contends that the entirety of the switching capacity would go down.  (Timmer Aff. ¶¶ 8-9.) Defendant has also presented evidence that the switches provide dial tone service to telephone customers of T2 Communications, LLC, and he is not aware of how CornerWorld will provide uninterrupted dial tone service to customers in Holland for calls, including 911 calls, from Texas.  (Timmer Aff. ¶¶ 100-11.)

In response to Defendant's objections regarding risks to operations during the switch, Plaintiff has presented evidence that the back-up switch, which was never operational in Holland, is being made fully operational in Texas.  (Beck Aff. ¶¶ 6-7.)  Accordingly, in the event of a technical breakdown, there will be redundancy in both personnel and equipment. (*Id.* at ¶ 7.)  "CornerWorld has incorporated a detailed, phased migration plan whereby both locations will run simultaneously until full migration to the lab switch as been completed." (*Id.* at ¶ 8.)  Plaintiff has also presented evidence that after the lab and primary switches have

been moved to Texas, equipment will remain in Holland to provide the T2 Communications, LLC dial tone service and allow for the ability o make 911 emergency service calls. (*Id*. at ¶ 9.)

While Defendant may disagree with CornerWorld's business decisions, there is nothing in the record to suggest that CornerWorld's decision to move the equipment was made lightly, that it was not motivated by a determination of what was in the best interest of CornerWorld and the subsidiary companies, or that it will create substantial risk to operations. The Court finds nothing in Defendant's objections that would cast doubt on the Special Master's legal conclusion that moving the equipment is not a materially adverse event that would support a finding of default under the operations prong of the Secured Debenture's definition of "Material Adverse Effect." The Court will accordingly adopt the Special Master's recommended finding that moving the switches from Michigan to Texas is not an event of default under the Secured Debenture. Because the Court has made this finding, the Court finds no need to enter a preliminary injunction prohibiting Defendant from taking any action to prevent the relocation. The Court is satisfied that Defendant understands that any resort to self-help tactics to prevent conduct that the Court has determined does not constitute a default would amount to contempt of court.

## B. Request for Preliminary Injunction

Defendant has requested the Court to schedule a hearing to enter a preliminary injunction enjoining Plaintiff from moving the switching equipment to Texas, and requiring

Plaintiff to return any collateral that has already been moved. The Court declines to do so. The Court has appointed the Special Master to oversee compliance with the transaction documents pending trial. Although Defendant has expressed concern that the Special Master's Recommendation operates as a recommendation of summary judgment on the issues before him, Defendant's concerns are unfounded. The Court is relying on the Special Master to serve as arbitrator of possible disputes between the parties pending trial. The Special Master's recommended findings are preliminary findings that either support or defeat a party's request for a preliminary injunctive relief. They do not replace a trial on the merits:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).

Based on the Special Master's findings, the Court concludes that entry of a preliminary injunction enjoining CornerWorld from moving the switching equipment is not warranted. To the extent Defendant seeks preliminary injunctive relief based on other alleged defaults, those are matters that should be brought first before the Special Master who is tasked with arbitrating disputes between the parties relating to compliance with the

Buy/Sell Agreements and Transaction Documents and the on-going operation of CornerWorld and its subsidiaries pending trial. (Dkt. No. 43, Order Appointing Sp. Master.)

## C. Compensation of Chief Financial Officer

CornerWorld's Board of Directors has voted to offer its Chief Financial Officer, V. Chase McCrea, a salary increase and a grant of stock options. Defendant has refused to to consent to the employment agreement. The Secured Debenture prohibits Plaintiff from increasing the compensation  payable to any officers or members of senior management "without the approval of Cornerworld's Board of Directors and the consent of Holder [Timmer], which consent shall not be unreasonably withheld." (Dkt. No. 8, Ex. 2, Sec. Deb. § 5(f)).

The Special Master has recommended that the Court make a finding that Defendant acted unreasonably in voting to disapprove the amended employment contract with Plaintiff's Chief Financial Officer. The Special Master further recommended that the Court expand the preliminary injunction to require Defendant's consent to the proposed contract.

Defendant objects to this recommendation. Defendant contends that as a Board Member he is required under Nevada Revised Statute 78.138(4)(a)[2] to consider the best interests of creditors, of which he is one. Defendant also contends that he was uncomfortable with offering the raise because Mr. McCrea, as CFO, did not provide financial information or a partial payment as required by the Earn Out Agreement, did not timely provide sufficient

_____

[2]Plaintiff CornerWorld is a Nevada corporation.  (Dkt. No. 1, Compl. ¶ 1.)

financial information for purposes of evaluating Plaintiff's 2010-2011 budget, and has not provided a plan for increasing revenue.

Although Defendant, as a board member, is permitted to consider the interests of creditors,[3] he may not do so to the exclusion of his primary fiduciary duty to the corporation. Board members are required to consider the best interests of the corporation. *See* Nev. Rev. Stat.§ 78.138 (West) ("Directors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation.").

The transcript of the Board meeting reveals that Defendant was complimentary of Mr. McCrea, but voted against the raise because he had an interest as a creditor in being paid. The Special Master found, based on the transcript, that Defendant's refusal to approve the contract with Mr. McCrea was based upon self-interest and not on the best interests of CornerWorld.

The Special Master's factual finding is supported by the transcript. There is no evidence that Defendant raised any concerns about Mr. McCrea to the Board. Defendant's sole expressed concern was about whether he was going to be paid. From the beginning of this case the Court has observed Defendant's single-minded focus on his rights in the event of default, rather than on the success of the businesses he sold. He has failed to consider

---

[3]Nevada law provides that "Directors and officers, in exercising their respective powers with a view to the interests of the corporation, **may** consider: (a) The interests of the corporation's employees, suppliers, creditors and customers." Nev. Rev. Stat. § 78.138 (West) (emphasis added).

what the businesses need to do to succeed.  The Court will accordingly adopt the Special

Master's finding that Defendant acted unreasonably in voting to disapprove the employment

contract with Mr. McCrea.  In light of the Court's determination that Defendant acted

unreasonably in withholding his consent, the Board may offer Mr. McCrea the salary increase

without obtaining Defendant's consent.  In light of this finding, the Court observes no need

to expand the preliminary injunction to require Defendant's consent to the proposed contract.

An order consistent with this opinion will be entered.


Dated: October 6, 2010                                    /s/ Robert Holmes Bell
                                                          ROBERT HOLMES BELL
                                                          UNITED STATES DISTRICT JUDGE